**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**MICHAEL BULGER,**

                              **Plaintiff,**

        **vs.**                                              **6:07-CV-542**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

                              **Defendant.**
_____

**Thomas J. McAvoy,**
**Sr. U.S. District Judge**


**DECISION & ORDER**


        Michael Bulger ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) to review a final determination of the Commissioner of Social Security ("Commissioner")

terminating Plaintiff's Social Security Disability Insurance Benfits ("DIB") and Supplemental

Security Income benefits ("SSI") under Titles II and XVI, respectively, of the Social Security Act

("the Act").


**I.      FACTS**

        **A. Procedural History**

        Plaintiff was awarded DIB and SSI on October 19, 2000 due to renal failure.  On February

24, 2004, Plaintiff was informed that as a result of medical improvement, he was no longer

1

considered disabled under Continuing Disability Review ("CDR"), and his benefits were therefore terminated.  Plaintiff's request for reconsideration was originally denied on June 17, 2004, and again after a review by a Disability Hearing Officer ("DHO").

On September 8, 2005, Plaintiff received a hearing in Johnstown, NY before Administrative Law Judge ("ALJ") Thomas P. Zolezzi.  After performing a *de novo* review of Plaintiff's disability claim, ALJ Zolezzi issued a decision on November 4, 2005 finding that Plaintiff's medical condition had improved and he was no longer disabled, thereby disqualifying him from receiving DIB and SSI.

Plaintiff made a timely request to the Appeals Council for review of the ALJ's decision.  On March 26, 2007, the Appeals Council denied Plaintiff's request for review, making the ALJ's ruling the Commissioner's final decision regarding Plaintiff's disability claim.  Plaintiff now seeks review of the Commissioner's final decision.

### B. Educational and Vocational History

Plaintiff was born on September 2, 1960. R. at 467.[1]  Plaintiff received special education services during his schooling, which ended after the ninth grade.[2] R. at 467.  Between 1990 and 2000, Plaintiff worked in the fields of leather finishing and siding installation. R. at 106.  In 2000, when Plaintiff first began receiving disability benefits, he was 40 years old.

---

[1]"R." refers to the Administrative Record.

[2]There is a discrepancy in the record as to whether Plaintiff completed the 9th or 10th grade.  This inconsistency is immaterial as either degree of schooling is considered "limited" under 20 C.F.R. §§404.1564(b)(3) and 416.964(b)(3).

**C. Medical History**

    **1. 2000-2004: Renal Disorder**

In August 2000, Plaintiff was admitted to Albany Medical Center Hospital and diagnosed with end-stage renal disease. R. at 181-86.  Hemodialisys was initiated, and an arteriovenous fistula was created in Plaintiff's upper left arm in order to create permanent access for treatment. R. at 189-90.  Plaintiff was discharged from Albany Medical Center Hospital on September 23, 2000 and received hemodialysis treatment at the Amsterdam Dialysis Center three times a week from September 2000 to November 2002. R. at 383-422.  In February 2001, Plaintiff had a temporary chest catheter that had been used for hemodialysis removed because it was no longer necessary following the creation of the arteriovenous fistula. R. at 299-301.

On November, 3, 2002, Plaintiff was again admitted to Albany Medical Center Hospital with a diagnosis of end-stage renal disease secondary to polycystic disease. R. at 199.  Plaintiff underwent a right side cadaveric renal transplant with no complications.  R. at 199-203.  On November 9, 2002 Plaintiff underwent another surgery for a nephrectomy - removal of the native right kidney - so that the right ureter could be used on the transplanted kidney. R. at 201.  Plaintiff was discharged on November 15, 2002, but was readmitted on November 28, 2002 with a small bowel obstruction which required an exploratory laparotomy with lysis of adhesions. R. at 204.  Plaintiff was discharged on December 10, 2002. Id.

From November 19, 2002 through December 19, 2002, Plaintiff made weekly visits to the Albany Medical College Section of Transplantation where he was followed by Drs. Conti, Escobar and Isenberg. R. at 280-82. Plaintiff's immunotherapy medication included Cellecpt, Medrol and Prograf, and he was also on Valcyte, Bactrim, Colace, baby aspirin, Pepcid, Nilstat, Malalox and

potassium phosphate. R. at 280. Plaintiff continued follow-up care at the Section of Transplantation from December 31, 2002 through October 14, 2003 with no transplant-related complications.

In April 2003, Plaintiff was diagnosed as suffering from Gastroesophageal reflux disease, ("GERD") and he was taken off Pepcid and placed on Prevacid. R. at 273.  In December 2003, Plaintiff underwent surgery for a recurrent small bowel obstruction.  R. at 268.  Follow-up visits in January and February 2004, and subsequent visits in April, June and September 2004 showed stable renal function.  R at 266-67, 330-32.  Baby aspirin was discontinued in June 2004 as Plaintiff complained of bruising easily.  R. at 331.  Plaintiff continued to suffer from GERD. R. at 329-30.

**2. 2002-2003: Right Shoulder Surgery**

In October 2002, Dr. Zimmerman, Plaintiff's primary care physician, referred Plaintiff to orthopedic surgeon Dr. Gerald Ortiz for evaluation of right shoulder pain.  R. at 218.  Dr. Ortiz's assessment was left should bursitis with trigger points[3], and he recommended that Plaintiff undergo physical therapy. Id.

On April 17, 2003, Plaintiff was evaluated by physical therapist Andrea Evans.  R. at 252. Plaintiff complained of right shoulder pain, prickling, tingling and weakness in the left hand and wrist, and overall fatigue and decreased strength.  Id.  Ms. Evans suspected carpal tunnel syndrome in Plaintiff's left wrist, and recommended that he undergo physical therapy treatment four times per week for four weeks. Id.  On May 13, 2003, Ms. Evans noted that after 17 physical therapy sessions, Plaintiff's exercise tolerance had improved, yet he was still restricted by fatigue and decreased strength and he had difficulty with lifting, carrying and repeated activities and required rest

---

[3]While Dr. Ortiz examined Plaintiff for right shoulder pain, his assessment refers only to Plaintiff's left shoulder.  This appears to be a possible typographical error on the part of Dr. Ortiz.  As this examination pre-dated Plaintiff's subsequent right rotator cuff repair, however, this discrepancy is immaterial.

throughout the day due to poor endurance. R. at 251.  Plaintiff's arm strengthening was limited due to a rotator cuff tear in his right shoulder. Id.

Plaintiff was examined by Dr. Ortiz again in April and May 2003 for evaluation of further right shoulder pain. R. at 217.  Dr. Ortiz suspected a right shoulder rotator cuff tear, and Plaintiff was given a script for an MRI Scan. Id.  The MRI revealed a full thickness rotator cuff tear and an arthroscopic-assisted repair was subsequently performed by Dr. Ortiz on May 27, 2003 at Amsterdam Memorial Hospital. R. at 288. Dr. Ortiz examined Plaintiff in a June 9, 2003 follow-up visit and noted that he was doing fairly well and physical therapy was again recommended. R. at 216.

Plaintiff resumed physical therapy three times a week with Ms. Evans beginning in June 2003. R. at 250.  On July 7, 2003, Ms. Evans recommended that Plaintiff continue physical therapy sessions for another four to six weeks. R. at 249.  Ms. Evans reported that Plaintiff complained of a 'clicking' noise during overhead motion, and concluded that he was "minimally limited with lifting and overall endurance due to rotator cuff repair and organ transplant." R. at 248.  On September 8, 2003, Ms. Evans noted that Plaintiff had completed 33 physical therapy sessions following his rotator cuff repair, and recommended that he be discharged from physical therapy as he had reached his maximal benefit at that point. Id.

### 3. 2004: Back and Knee Pain

Plaintiff visited Dr. Zimmerman in July 2004, complaining of acute lower back pain and right shoulder pain. R. at 325.  Dr. Zimmerman again referred Plaintiff to Dr. Ortiz. Id.  On July 14, 2004, Dr. Russell Cecil, an orthopedic surgeon and colleague of Dr. Ortiz, examined Plaintiff and ordered X-rays of his back. R. at 312.  The X-rays showed slight osteopenia and minimal evidence of disc degeneration. Id.  Dr. Cecil diagnosed bursitis in Plaintiff's right shoulder and a sprain of the lumbar

5

spine and suggested physical therapy. Id.

Plaintiff resumed physical therapy with Ms. Muhlebeck (formerly Evans) on July 21, 2004. R. at 432. Ms. Muhlebeck noted that Plaintiff was unable to "complete daily activities including lifting, feeding, sleeping, transfers, laundry, and gripping without increased discomfort in the shoulder and back." Id. Palpable spasms in the right lower lumbar paraspinals and gluteals muscles were also noted. Id. Ms. Muhlebeck recommended that Plaintiff continue physical therapy sessions two to three times a week for a four week period. Id. On August 24, 2004, Ms. Muhlebeck noted that Plaintiff's strength had increased during the previous month of physical therapy, but reported that his daily activities were still limited due to restricted endurance and motivation. R. at 431. On September 20, 2004, Ms. Muhlebeck again noted that Plaintiff's strength and overall endurance had improved, but that "restricted endurance and medical maladies" still limited his daily activities. R. at 430.

During a September 29, 2004 visit to Dr. Ortiz, Plaintiff complained of right knee pain and catching. R. at 314. Dr. Ortiz diagnosed a probable medial meniscal tear which was confirmed by a subsequent MRI. R. at 314-15. Plaintiff underwent a medial meniscectomy of the right knee on November 9, 2004. R. at 368.

At a follow-up visit on November 18, 2004, Dr. Ortiz noted mild swelling, some stiffness and "[s]ome pain over the portals and ecchymosis," and recommended physical therapy. R. at 316. Plaintiff again visited Ms. Muhlebeck from November 23, 2004 to January 2005 when Dr. Ortiz recommended that his stretching exercises be completed at home. R. at 317. On December 27, 2004, Ms. Muhlebeck noted that Plaintiff complained of occasional catching in his right knee and stiffness during cold weather. Ms. Muhlebeck also noted that Plaintiff's ability to "complete prolonged

sitting, standing or lying, lifting, changing positions, walking, stair climbing and doing laundry, housekeeping and shopping" was limited. R. at 427.

### 4. 2005: Polycystic Left Kidney Disease and Hernia Repair

On May 5, 2005, Plaintiff complained to Dr. Zimmerman of fatigue and left side lower back pain. R. at 323.  Dr. Zimmerman ordered a renal ultrasound which revealed a polycystic left kidney and a normal right renal transplant. R. at 327. Plaintiff suffered left side pain in July 2005 and a subsequent renal ultrasound ordered by Dr. Zimmerman showed "innumerable small predominantly anechoic cysts." R. at 353.

During a June 7, 2005 visit with Dr. Conti at the Albany Medical College Section of Transplantation, Plaintiff was determined to have a "large ventral hernia with some skin atrophy at the umbillical portion of the hernia."  R. at 449. Dr. Conti performed a ventral hernia repair on Plaintiff on June 20, 2005. R. at 334.  During the procedure, a large amount of adhesions of the small bowel were also removed. R. at 345.  During a June 22, 2005 exam, Dr. Conti also noted multiple calcifications in the region of the left renal pelvis. R. at 347.  Plaintiff was discharged on June 26, 2005, and Dr. Conti reported that plaintiff was recovering well after a July 5, 2005 follow-up examination. R. at 448.

### 5. 2006: Evidence Submitted to the Appeals Council

Plaintiff's representative supplemented her February 14, 2006 argument to the Appeals Council by submitting additional evidence regarding the condition of Plaintiff's left wrist. R. at 8-10,461-62.  On January 4, 2006, Plaintiff complained to Dr. Ortiz of left wrist pain.  R. at 461.  Dr. Ortiz ordered an X-ray which revealed a schaphoid fracture, osteoarthritis and a suggestion of avascular necrosis of the left wrist.  R. at 461-62.

**6. Treating Source Reports**

**i. Dr. Alexander Zimmerman (Primary Care Physician)**

On July 12, 2005, Dr. Alexander Zimmerman completed a Physical Capacities Evaluation detailing Plaintiff's ability to perform work related activities on a day-to-day basis. R. at 363-64. Dr. Zimmerman noted that during an eight hour work day, Plaintiff would be able to sit for two hours, stand for four hours and walk for one hour. R. at 363. Dr. Zimmerman also noted that Plaintiff could not lift any amount of weight due to his recent hernia surgery, and that Plaintiff was unable to push or pull with either hand or arm. Id.

Furthermore, Dr. Zimmerman reported that Plaintiff should never bend, squat, kneel, crawl or reach above shoulder level, and that Plaintiff was unable to work around heights, moving machinery, temperature extremes, chemicals, dust, odors, fumes/gases, humidity or vibration. R. at 364. Dr. Zimmerman further noted that Plaintiff suffered from chronic renal failure with polycystic kidney disease, had undergone a renal transplant, and that his recent hernia surgery limited his activities. Id.

**ii. Andrea Muhlebeck (Physical Therapist)**

On July 6, 2005, Andrea Muhlebeck, Planitiff's physical therapist, also completed a Physical Capacities Evaluation. R. at 424-25. Ms. Muhlebeck noted that during an eight hour work day, Plaintiff would be able to sit for one hour, stand for twenty minutes, walk for 30 minutes and that Plaintiff had to change positions regularly during any of these activities. R. at 424. Ms. Muhlebeck also noted that Plaintiff could occasionally lift up to five pounds but could never lift any amount of weight on a frequent basis. Id. According to Ms. Muhlebeck's report, Plaintiff would experience pain if he lifted or carried more than five pounds, and Plaintiff was unable to push or pull with either hand or arm. Id.

Furthermore, Ms. Muhlebeck reported that Plaintiff could occasionally bend or reach above shoulder level, but could never squat, kneel, crawl, and that Plaintiff was unable to work around heights, moving machinery, temperature extremes, chemicals, dust, odors, fumes/gases, humidity or vibration. R. at 425. Ms. Muhlebeck further noted that Plaintiff had recently undergone a hernia repair, had previously undergone a right shoulder rotator cuff repair and right knee meniscectomy and had a history of kidney transplant with complications. Id.

### 7. Consultative Examination Reports

### i. Dr. Richard Adler

On January 12, 2004, Plaintiff attended an internal medicine consultative examination with Dr. Richard Adler at the request of the Social Security Administration ("SSA"). R. at 253-257. Dr. Adler noted Plaintiff's history of bilateral polycystic renal disease and right kidney transplant along with his history of post-surgical intestinal obstruction and right rotator cuff repair. R. at 256. Dr. Adler also reported that Plaintiff complained of significant mood swings following his surgery. R. at 253.

Dr. Adler's prognosis for Plaintiff's renal transplant and rotator cuff repair was fair to good. R. at 256. In assessing Plaintiff's limitations, Dr. Adler reported that Plaintiff's ability to participate in activities that expose him to infection was moderately restricted because of the multiple medications that he was taking. Id. Dr. Adler also noted that Plaintiff should avoid lifting above his head because of his history of rotator cuff injury. Id.

### ii. Dr. Amelita Balagtas

On January 12, 2004, Plaintiff also attended an orthopedic consultative examination with Dr. Amelita Balagtas at the request of the SSA. R. at 258-260. Dr. Balagtas' physical examination of

9

Plaintiff was unremarkable with the exception of punctate marks on Plaintiff's right shoulder from his arthroscopic surgery and tenderness on the anterior aspect of his shoulder. R. at 259.  Dr. Balagtas reported that Plaintiff would have "some limitations in activities that require lifting, carrying, and reaching involving the right upper extremity," but did not quantify these limitations. R. at 260.

### 8. Non-Examining Physician Report

On February 19, 2004, Dr. Richard Blaber reviewed Plaintiff's medical records and completed a Request for Medical Advice form. R. at 283.  Dr. Blaber concluded that medical improvement had occured and that Plaintiff was capable of lifting 20 pounds occasionally and 10 pounds frequently.  Id.  Dr. Blaber also concluded that during an eight hour work day, Plaintiff had the capacity to sit, stand and walk for six hours each. Id.

### 9. Plaintiff Testimony

In November 2003, Plaintiff completed a Function Report as part of his continuing disability review.  Plaintiff complained of headaches, back pain, occasional shoulder pain, mood swings related to his medication, easy bruising and a lack of energy. R. at 124-131.  Plaintiff noted that he could walk one mile before having to stop for ten to 20 minutes to rest. R. at 130. Plaintiff further noted that his activities included occasional walks, simple cooking, doing laundry and house cleaning with occasional assistance and taking a monthly trip to Albany. R. at 124-131.

On September 8, 2005 Plaintiff received a hearing before ALJ Zolezzi.  Plaintiff testified that he suffered from lower back pains centralized in the area of his kidney transplant that he likened to a burning ball. R. at 470.  He noted that he could sit for one hour before his back "[went] out on [him]," and he was forced to change positions. Plaintiff also complained of continued shoulder pain

during overhead lifting. R. at 474.  He claimed to have minimal functional capacity of his left arm because of a permanent dialysis graft. R. at 483, 495.  He testified that the heaviest weight that he would be able to lift would be 20 to 25 pounds and that his ability to grasp or hold objects was limited because of carpal tunnel in his left hand.  R. at 482.

Plaintiff further noted that he has to visit Dr. Aconti or Isenberg every four months for monitoring of his polycystic left kidney. R. at 473.  He reported suffering from headaches that occurred at least three times a week and that lasted between 30 minutes and an entire day. R. at 476-77.  As a result of taking steroids and other prescribed medication, Plaintiff claimed to suffer from diarrhea and cramps and noted that his doctors told him that his medications would cause bone deterioration. R. at 481.

## II.      BURDEN OF PROOF

In cases of benefit termination, the claimant bears the initial burden of showing, by means of medical evidence, that he is disabled as defined in the Act. Matthews v. Eldridge, 424 U.S. 319, 336 (1976)(citation omitted).  For purposes of both DIB and SSI, a claimant is deemed disabled if they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." Berry v. Schweiker, 675 F.2d 464, 466 (2d Cir. 1982) (quoting 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A)).

Once a disability is established, the burden shifts to the Commissioner to show "the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform" considering his physical capacity, age, education and training.  Parker v. Harris, 626

F.2d 225, 231 (2d Cir. 1980) (citations omitted). A termination of benefits, once awarded, requires a showing by the Commissioner of substantial evidence which demonstrates that "there has been any medical improvement in the [claimant's] impairment or combination of impairments," as it relates to claimant's ability to work, and that the claimant is now capable of performing substantial gainful activity. 42 U.S.C. §423(f).

To ensure uniformity, the following analysis is used to determine whether a claimant's disability continues:

1. Is claimant engaging in substantial gainful activity?
2. If not, does claimant have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1?
3. If not, has there been any medical improvement? If yes, see step 4. If no, see step 5.
4. Is the medical improvement related to claimant's ability to perform work? If yes, see step 6. If no, see step 5.
5. If there has been no medical improvement, or the medical improvement does not relate to claimant's ability to do work, do any exceptions in ¶s (d) and (e) of this section apply?
6. If medical improvement is shown, does claimant have a severe impairment or combination of impairments?
7. If claimant's impairment(s) is severe, can claimant perform past work?
8. If claimant cannot perform past work, can claimant perform other work considering his age, education and past work experience?

20 C.F.R. §§ 404.1594(f) and 416.994(b)(5). Medical improvement is defined in the regulations as "any decrease in the severity of [a claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant] was disabled or continued to be disabled." 20 C.F.R. §§ 404.1594(b)(1) and 416.994(b)(1)(I). A finding that the severity of a medical condition

has decreased must be based on "changes (improvements) in the symptoms, signs and/or laboratory findings associated with [a claimant's] impairment(s)." Id.

## III.    STANDARD OF REVIEW

In reviewing the Commissioner's final decision, a court's inquiry is limited to two determinations: (1) whether the Commissioner applied the correct legal standard; and (2) whether the Commissioner's "conclusions were supported by substantial evidence in the administrative record." Lamay v. Comm'r of Soc. Sec., 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is not a "mere scintilla," but rather is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Lamay, 562 at 507 (citing Richardson v. Perales, 402 U.S. 389, 401 (1971).

## IV.    ALJ  FINDINGS

In his November 4, 2005 decision, the ALJ found that Plaintiff's successful kidney transplant constituted medical improvement related to his ability to work as he no longer had an impairment that met Listing 6.02A. R. at 26.  Furthermore, he found that Plaintiff's post transplant status, together with his hernia repair, rotator cuff repair and knee impairment status post meniscectomy constituted a "severe" impairment, but did not "meet or equal in severity the clinical criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4." R. at 21,26.

In determining whether Plaintiff was able to perform his past work or other work existing in the national economy in significant numbers, ALJ Zolezzi first had to assess Plaintiff's residual

functional capacity ("RFC").[4]  He found that Plaintiff retained the capacity to lift, carry, push and pull 20 pounds occasionally and ten pounds frequently. R. at 26.  Further, he found that in the course of an eight hour work day with normal breaks, Plaintiff could sit for six hours and stand and/or walk for two hours. Id.  ALJ Zolezzi also found that Plaintiff had to avoid personal contact with a large number of people because of his increased risk of infection and his need for immunosuppressant therapy for his renal transplant. Id.

In making these determinations, ALJ Zolezzi considered the opinions of Drs. Balagtas, Adler, Isenberg, Zimmerman, Blaber and Physical Therapist Andrea Muhlebeck. The ALJ accepted and gave great weight to Dr. Isenberg's May 2003 opinion that Plaintiff's medical problems were stable and required no further lifting restrictions from a transplant standpoint. R. at 22.  ALJ Zolezzi gave careful consideration to non-examining State Agency consultant Dr. Blaber who reported in February 2004 that Plaintiff could lift 20 pounds occasionally, ten pounds frequently and could sit, stand and/or walk for six hours during an eight hour work day. R. at 23.

While examining physician Dr. Balagtas reported that Plaintiff would have some limitations relating to his right upper extremity when lifting, carrying and reaching, ALJ Zolezzi concluded that such unquantified restrictions related only to Plaintiff's arthroscopic shoulder repair and were temporary in nature. R. at 22.  In response to examining physician Dr. Adler's assessment that Plaintiff should avoid lifting above his head, ALJ Zolezzi noted that Plaintiff had not seen a doctor for shoulder treatment since August 2004. Id.  Dr. Adler's suggestion that Plaintiff avoid activities that may expose him to infection was accepted by the ALJ. Id.

---

[4]Residual Functional Capacity ("RFC"): The most an individual can still do despite their physical and/or mental limitations that affect what they can do in a work setting. 20 C.F.R. §§ 404.1545 and 416.945

ALJ Zolezzi declined to afford considerable weight to the opinion of Plaintiff's primary care physician, Dr. Zimmerman. R. at 22-23.  The ALJ found that the conclusions reached in Dr. Zimmerman's physical capacity evaluation regarding Plaintiff's limitations were not supported by the documentary evidence of record or Plaintiff's personal testimony.  R. at 22.  The ALJ concluded that the restrictions on lifting noted by Dr. Zimmerman were related to Plaintiff's hernia repair, and were only temporary. R. at 22-23.  Plaintiff's physical therapist, Andrea Muhlebeck, noted similarly limiting restrictions in her July 2005 physical capacity evaluation. R. at 424-25.  ALJ Zolezzi afforded Ms. Muhlebeck's opinion little weight because physical therapists are considered unacceptable medical sources. R. at 23.

The ALJ also considered Plaintiff's testimony pursuant to 20 C.F.R. §§ 404.1529 and 416.929.  He concluded that Plaintiff's back impairment was not severe as there was insufficient evidence to show that it produced more than a minimal effect on Plaintiff's ability to perform basic work functions. R. at 24.  In response to Plaintiff's testimony regarding sitting, standing and walking, the ALJ "gave the [Plaintiff] the benefit of the doubt . . . and limited his standing and/or walking to two hours per day." Id.  Plaintiff's claim that his doctors had permanently restricted use of his upper left extremity because of the graft for dialysis was rebutted by the ALJ for lack of sufficient documentary evidence of record. Id.  Furthermore, ALJ Zolezzi found that despite the possibility that Plaintiff suffers from headaches and some memory problems, "there [was] no evidence to show that they [were] of the intensity, duration or frequency as to preclude the performance of work-related functions." Id.  In sum, the ALJ found that Plaintiff's allegations were not indicative of total disability but instead displayed an ability to perform a wide range of activities despite his impairment. R. at 24-25.

15

Based on Plaintiff's RFC, ALJ Zolezzi determined that Plaintiff was unable to return to his past relevant work as a siding installer. R. at 25. The position of siding installer is considered medium work, which the ALJ found required activities precluded by Plaintiff's RFC. Id.

Having determined that Plaintiff was unable to perform his past relevant work, ALJ Zolezzi next considered Plaintiff's age, education and past work experience in conjunction with the Medical-Vocational Guidelines ("the Grids") in holding that Plaintiff was capable of performing substantially all of the requirements of sedentary work, and therefore was not disabled. R. at 25-26. The ALJ found that Plaintiff was a "younger individual" as defined in 20 C.F.R. §§ 404.1563 and 416.963, and that he had limited education and no transferrable skills from past relevant work. R. at 25. ALJ Zolezzi further found that Plaintiff had the exertional capacity to perform all of the requirements of sedentary work as set forth in the Grids, and that his need to avoid personal contact with a large number of people did not significantly impact the number of sedentary jobs available in the national economy which he could perform. R. at 26. Accordingly, the ALJ determined that Plaintiff's disability ceased as of February 29, 2004. Id.

## V.    DISCUSSION

### A. Medical Improvement

Plaintiff first argues that the ALJ erred in finding that Plaintiff's medical condition constituted medical improvement. Dkt. No. 14, at 15. Medical improvement is "any decrease in the severity of [a claimant's] impairment(s) which was present at the time of the most recent favorable medical decision that [the claimant] was disabled or continued to be disabled." 20 C.F.R. §§ 404.1594(b)(1) and 416.994(b)(1)(I). A finding that the severity of a medical condition has

decreased must be based on "changes (improvements) in the symptoms, signs and/or laboratory findings associated with [a claimant's] impairment(s)." Id.

On October 19, 2000, Plaintiff was awarded DIB and SSI because his impairment of renal function satisfied 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 6.02A. After receiving his kidney transplant in November 2002, Plaintiff satisfied Listing 6.02B, which affords a presumption of disability for 12 months post-transplant. After the 12 month grace period, Listing 6.02B calls for a residual impairment evaluation pursuant to Listing 6.00E2, considering the following factors: occurrence of rejection episodes; side effects of immunosuppressants, including corticosteroids; frequency of any renal infections; and presence of systemic complications.

Plaintiff argues that his multiple surgeries to remove small bowel instructions in 2002, 2003 and 2005, and his 2005 hernia repair constitute systemic complications resulting from his kidney transplant. Dkt. No. 14, at 16. Additionally, Plaintiff claims that his increased susceptibility to infection, stomach disorders, headaches, diarrhea, easy bruising and mood changes qualify as side effects of immunosuppressants. Id. Plaintiff contends that these factors support a finding of continued disability under Listing 6.02B, and show that no medical improvement has occurred. Id.

Plaintiff's treating physicians consistently reported that he was doing well in relation to his kidney transplant and that his serum creatinine levels were stable. Examining physician Dr. Adler reported that Plaintiff's prognosis for renal transplant was fair to good, and Dr. Blaber, a State agency non-examining physician, reported in 2004 that Plaintiff had experienced medical improvement. R. at 256, 283. Plaintiff had no reported rejection episodes or renal infections. Furthermore, Plaintiff testified on September 8, 2005 that he was not experiencing any complications with his kidney, and that it was "fine." R. at 472. Accordingly, ALJ Zolezzi's finding that Plaintiff

17

experienced medical improvement related to his ability to work is supported by substantial evidence, and is upheld.

### B. Plaintiff's Ability to Perform Substantial Gainful Activity

Plaintiff contends next that even if medical improvement did occur, the ALJ erred in finding that Plaintiff retained the capacity to perform substantial gainful activity despite his current impairments. Dkt. No. 14, at 16.  Plaintiff argues that the ALJ was incorrect in both failing to afford considerable weight to Plaintiff's primary care physician and physical therapist and in relying on the Medical-Vocational Guidelines.

### 1. Weight Given to Opinions of Treating Physician and Physical Therapist

### i. Dr. Zimmerman (Primary Care Physician)

A treating physician's opinion receives controlling weight if it is well supported by medically acceptable clinical and laboratory findings and is not inconsistent with the other substantial evidence of record. 20 C.F.R. §§ 404.1527(d) and 416.928(d).  When a treating physician's opinion is not afforded controlling weight, the following factors are considered in determining the weight given: (i) length of the treatment relationship and frequency of examination; (ii) nature and extent of the treatment relationship; (iii) medical evidence supporting opinion; (iv) degree to which the opinion is consistent with the record as a whole; (v) specialization of physician; and (vi) other relevant factors. Id.  Where these factors are applied, specific reasons explaining the weight given to the treating physician's opinion are required. Id.

ALJ Zolezzi declined to afford controlling weight to the opinion of Dr. Zimmerman, Plaintiff's primary care physician, that Plaintiff's physical and environmental limitations restricted

him from performing a full range of work even at the sedentary level. R. at 22.  The ALJ found that Dr. Zimmerman's opinion was not supported by documentary evidence of record. Id.  Instead, the ALJ afforded weight to the opinions of Drs. Isenberg, Balagtas, Adler and Blaber. R. at 22-23.

Where two or more properly submitted medical opinions are at odds with each other, it is within the ALJ's discretion to determine which opinion will receive controlling weight. Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (internal citations omitted).  This comparison is necessarily predicated on a reasonable temporal or topical similarity between the opinions being compared.  In the present case, the reports of Dr. Isenberg, examining physicians Adler and Balagtas and non-examining physician Blaber were submitted between May 2003 and February 2004.  Dr. Zimmerman, however, completed his physical capacity evaluation in July 2005.  In the year and a half that elapsed between these opinions, Plaintiff was diagnosed with bursitis in his right shoulder and a sprain of the lumbar spine, underwent a medial meniscectomy of his right knee, a hernia repair, bowel obstruction surgery and experienced complications from his polycystic left kidney. R. at 312, 368, 327, 334-35.  Accordingly, it was inappropriate for the ALJ to diminish the weight afforded to Dr. Zimmerman's opinion based on it being inconsistent with the reports of Drs. Balagtas, Adler and Blaber, as these reports were incomplete and outdated.

Instead, the ALJ should have more fully developed the record before comparing the respective medical opinions.  Where there are clear gaps in the administrative record, an ALJ cannot dismiss a treating physician's opinion without first attempting to fill those gaps. Rosa v. Callahan, 168 F.3d 72, 79 (2d Cir. 1999) (citation omitted). In fact, where there are obvious deficiencies, the ALJ bears an affirmative duty to fully develop the administrative record even if the claimant is represented by counsel. Id. (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)).

19

In the present case, the ALJ failed to properly develop the record on multiple occasions. First, before providing considerable weight to the outdated opinions of Drs. Isenberg, Adler, Balagtas and Blaber, the ALJ should have requested that the doctors update their respective reports to include the multiple subsequent medical events.  Second, the ALJ made the presumption that the lifting restrictions articulated by Dr. Zimmerman pertained only to the period immediately following Plaintiff's hernia repair and were not permanent. R. at 23-24.  If ALJ Zolezzi felt that Dr. Zimmerman's report was ambiguous on this point, he should have sought clarification rather than interjecting his own judgment.  Finally, because Dr. Balagtas failed to quantify Plaintiff's physical limitations in her report, the ALJ presumed that the restrictions were related to his recent arthroscopic shoulder surgery and did not exceed those articulated in the ALJ's RFC determination. R. at 22.  Again, the ALJ should have sought clarification rather than substituting his own judgment.

In light of the clear gaps in the administrative record, further acquisition of information is needed before the ALJ can make a proper determination of which medical opinions are to receive controlling weight.

### ii. Andrea Muhlebeck (Physical Therapist)

While physical therapists cannot establish the existence of a medically determinable impairment, their opinions "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." SSR 06-03p.  Furthermore, under the SSA regulations, adjudicators are required to consider any factors provided which tend to support or contradict a medical opinion of record.  20 C.F.R.§§ 404.1527 and 416.927; see also SSR 06-03p.

In considering the opinion of a physical therapist, the ALJ can utilize the same factors used to

20

assess medically acceptable opinions, including the frequency of treatment, consistency with other evidence, degree of supporting evidence, thoroughness of explanation and whether the source has an area of expertise. SSR 06-03p.  While they are not required to afford considerable weight to the opinion of a physical therapist, "the adjudicator generally should explain the weight given to opinions from 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." Id.

ALJ Zolezzi afforded little weight to the opinion of Andrea Muhlebeck, Plaintiff's physical therapist, because she was  not an "acceptable medical source" as defined in 20 C.F.R.§§ 404.1502 and 416.902. R. at 23.  The ALJ failed to elaborate on his decision to discount Ms. Muhlebeck's opinion despite the fact that she evaluated and treated Plaintiff extensively over a two year period.

Accordingly, while the ALJ was not obligated to afford Andrea Muhlebeck's opinion considerable weight, dismissal of her opinion without adequate explanation was inappropriate in light of the considerable extent and duration of her professional evaluation of Plaintiff.

### 2. Application of the Medical-Vocational Guidelines (the "Grids")

Plaintiff's final contention is that the ALJ improperly applied the Medical-Vocational Guidelines in the present case.  Dkt. No. 14, at 20.  Plaintiff argues that the non-exertional impairments articulated by Dr. Zimmerman sufficiently limited Plaintiff's ability to perform work so as to require testimony of a vocational expert before a finding of non-disability could be reached. Dkt. No. 14, at 21-22.

The Grids are used to determine whether a claimant can perform any level of alternative substantial gainful work which exists in the national economy. 20 C.F.R. § 404, Subpt. P, App. 2.

Where a claimant has only exertional impairments, the Commissioner's burden is satisfied by the application of the Grids. Bapp v. Bowen, 803 F.2d 601, 604 (2d Cir. 1986). Where a claimant has both exertional and non-exertional impairments, however, application of the Grids is improper if the claimant's non-exertional impairments "significantly limit the range of work permitted by his exertional limitations." Id. at 605 (quotations omitted). The testimony of a vocational expert, or similar evidence, is required where a claimant's non-exertional limitations significantly diminish their ability to perform any level of alternative substantial gainful work. Id. At 606.

In the present case, the ALJ considered Plaintiff's RFC, age, education, work experience and non-exertional limitations and determined that Plaintiff could perform substantial gainful work at the sedentary level. R. at 26. ALJ Zolezzi found that Plaintiff's only non-exertional impairment was the need to avoid personal contact with a large number of people, and that this limitation did not significantly limit Plaintiff's ability to perform sedentary work. Id. In reaching this conclusion, the ALJ afforded no weight to Dr. Zimmerman's assertion that Plaintiff was unable to work around heights, moving machinery, temperature extremes, chemicals, dust, odors, fumes/gases, humidity or vibration. R. at 26, 364. While the ALJ noted that the objective evidence did not support Dr. Zimmerman's environmental limitations, he did not indicate to which evidence he was referring. R. at 23. It appears, however, that the ALJ based his environmental restriction findings on Dr. Adler's January 2004 assertion that Plaintiff's ability to participate in activities that exposed him to infection was moderately restricted. R. at 22. As noted previously, Dr. Adler's 2004 report was outdated and incomplete as it did not consider several of Plaintiff's subsequent medical events, and the ALJ should have asked that it be made current before using it as a supporting medical opinion. Alternatively, the ALJ may not have relied on Dr. Adler's report and instead may have substituted

his own opinion despite the absence of a valid supporting medical opinion.  Such a substitution would be improper.  <u>Balsamo</u>, 142 F.3d at 81.  In either case, the gaps in the record must be filled before a proper finding on Plaintiff's environmental limitations can be made.

The Commissioner argues that under SSR 85-15,  environmental restrictions cannot constitute a "significant limitation," thereby rendering this issue immaterial. Dkt. No. 16, at 19.  This is an incomplete reading of SSR 85-15.  Under a proper reading of SSR 85-15, a claimant's need to avoid *excessive* amounts of noise, dust, etc. is minimally limiting while a claimant's need to avoid *very little* amounts of noise, dust, etc. may have a considerable impact on their ability to perform work (emphasis added). The severity of the environmental limitation is therefore determinative. Where the claimant's restriction falls somewhere in the middle of these poles, "resolution of the issue will generally require consultation of occupational reference materials or the services of a [vocational specialist]." SSR 85-15.

While Dr. Zimmerman stated the nature of Plaintiff's limitations, he did not articulate the degree of severity of the limitations.  R. at 364.  Dr. Adler noted that Plaintiff's limitations were only 'moderately restricted,' but, again, he did so with incomplete information upon which to make this determination.  As such, adequate supplementation of the record is necessary before either opinion can be deemed determinative on this issue.

Accordingly, the appropriateness of the application of the Grids cannot be determined until the record is adequately developed so as to allow the ALJ to properly ascertain the extent and severity of Plaintiff's environmental limitations.

**VI. CONCLUSION**

Remand to the Secretary for further development of the evidence is appropriate where the ALJ has applied an incorrect legal standard or there are gaps in the administrative record. Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980).

In the present case, the ALJ did not adequately satisfy his affirmative duty to fill various gaps in the administrative record before determining which medical opinion(s) would receive controlling weight.  The ALJ also failed to sufficiently develop the record before determining whether Plaintiff's non-exertional restrictions significantly limited his ability to perform gainful work at the sedentary level.  The considerable gaps in the administrative record preclude the possibility of a well-supported finding that Plaintiff was not disabled under the Act.  Accordingly, the Court  hereby ORDERS that the case be remanded to the Commissioner for proceedings consistent with this decision.

IT IS SO ORDERED.

Dated:July 1, 2009

Thomas J. McAvoy
Senior, U.S. District Judge

24